1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                FOR THE DISTRICT OF OREGON

11                    PORTLAND DIVISION

12   ROBERT S. HARRIS,            )
                                  )
13                Plaintiff,      )
                                  )      No.  CV-09-1229-HU
14        v.                      )
                                  )
15   COMMISSIONER of Social       )
     Security,                    )      FINDINGS & RECOMMENDATION
16                                )
                  Defendant.      )
17   ─────────────────────────────)

18

19   Richard A. Sly
     1001 S.W. Fifth Avenue, Suite 310
20   Portland, Oregon 97204

21   Linda S. Ziskin
     P.O. Box 2237
22   Lake Oswego, Oregon 97035

23        Attorneys for Plaintiff

24   Dwight Holton
     UNITED STATES ATTORNEY
25   District of Oregon
     Adrian L. Brown
26   ASSISTANT UNITED STATES ATTORNEY
     1000 S.W. Third Avenue, Suite 600
27   Portland, Oregon 97204-2904

28   / / /

1 - FINDINGS & RECOMMENDATION

Leisa A. Wolf
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

HUBEL, Magistrate Judge:

     Plaintiff Robert Harris brings this action for judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB) and Supplemental Security Income (SSI).  This Court has jurisdiction under 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)).  For the reasons below, I recommend that the Commissioner's decision be affirmed.

PROCEDURAL BACKGROUND

     Plaintiff initially applied for SSI and DIB on December 20, 2001, alleging an onset date of January 1, 1999.  Tr. 150-52. His application was denied initially and on reconsideration, and plaintiff did not appeal.  Tr. 105-09, 111-15.

     Plaintiff protectively filed the current application for DIB and SSI on November 18, 2003, alleging the same disability onset date of January 1, 1999.  Tr. 153-55, 253, 1088-90.  This application was denied initially and on reconsideration.  Tr. 116-20, 133-35, 1092-99.  On May 23, 2005, plaintiff appeared for a hearing before an Administrative Law Judge (ALJ).  Tr. 887-936.  On July 13, 2005, the ALJ found plaintiff not disabled.  Tr. 655-63. On July 31, 2006, the Appeals Council reversed the ALJ's decision and remanded for further proceedings.  Tr. 699-700.

     On remand, the ALJ held another hearing on January 11, 2007. Tr. 937-60.  On March 8, 2007, the ALJ issued a second opinion

2 - FINDINGS & RECOMMENDATION

finding plaintiff not disabled.  Tr. 92-102.  The Appeals Council denied plaintiff's request for review, making the ALJ's decision the Commissioner's final decision.  Tr. 77-80, 991-94.

Plaintiff sought judicial review in this court, and Judge Hogan ultimately reversed and remanded for reconsideration based on his conclusion that the ALJ erred at step five.  Tr. 979-87.  On August 21, 2009, a remand hearing was held in front of a different ALJ.  Tr. 1100-19.  The ALJ issued an opinion on September 16, 2009, finding plaintiff not disabled.  Tr. 966-78.  His decision is the agency's final decision.

FACTUAL BACKGROUND

Plaintiff alleges disability based on degenerative disc disease of the cervical and lumbar spine, bilateral carpal tunnel syndrome, tendon tears, degenerative disease in the right shoulder, and a pain disorder.  Tr. 153.  At the time of the most recent hearing, plaintiff was 49 years old.  Tr. 976. Plaintiff has a GED and some additional electronics training.  Tr. 768, 898-99, 976. He has past relevant work as a commercial glazer, construction worker, electrician, and electronics worker.  Tr.976.

I.  Medical Evidence

The medical evidence begins with selected chiropractic records from June 29, 1994, to August 1, 1995.  Tr. 640-51.  The next records begin in May 1998, when plaintiff reported experiencing pain and numbness in his hands. Tr. 313.  After his initial visit, plaintiff's doctor recommended that plaintiff could work so long as the work did not require repetitive pushing, pulling, or grasping. Tr. 317.  Plaintiff was ultimately diagnosed with bilateral carpal tunnel syndrome and underwent surgery on both hands.  Tr. 298-313.

After surgery, plaintiff was limited to light duty work. Tr. 314.

On July 11, 2001, plaintiff was evaluated by Dr. Maurice Collada, M.D., P.C., for reports of low back and left lower extremity pain and numbness, and neck and bilateral arm numbness. Tr. 322, 347-48.    Plaintiff reported that his symptoms had increased over the previous two years.    Id.    Dr. Collada's physician assistant Peter Musacchio reviewed plaintiff's most recent spinal x-rays (Tr. 349-50) and noted that there were some degenerative changes in the cervical and lumbrosacral spine.    Tr. 323.    He noted that plaintiff was having difficulty with flexion-type activities and ordered additional testing.    Tr. 323.    After reviewing the results of new x-rays and an MRI of the lumbrosacral spine (Tr. 607-08), PA Musacchio noted that while the MRI showed disc bulges, it did not reflect anything that would necessitate surgical intervention.    Tr. 323, Tr. 347-48.

On October 26, 2001, plaintiff was evaluated at Dr. Collada's request by Dr. Erik D. Blake, M.D., for low back pain. Tr. 319-21. On physical examination, Dr. Blake noted lumbar range of motion was restricted to flexion, which was accompanied by pain complaints. Tr. 320.    There was no restriction of lumbar extension, but there was mild restriction of bilateral lumbar side bending and restricted rotation on both sides.    Id.    Faber testing was mildly positive on the right and negative on the left, and the straight leg extension was negative.    Id.    Dr. Blake noted that the most recent x-rays and MRI of the lumbar and cervical spine revealed degenerative changes.    Id.    During a discussion regarding treatment options, plaintiff expressed no interest in pursuing an evaluation with the Functional Rehabilitation Services program or in taking

4 - FINDINGS & RECOMMENDATION

medication.   Tr. 321.   Consequently, Dr. Blake recommended that plaintiff pursue physical therapy. Id.

On February 26, 2002, DDS physician Dr. Martin Kehrli, M.D., completed a physical RFC assessment, concluding that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk with normal breaks for a total of six hours in an eight hour workday, sit with normal breaks for approximately six hours in an eight hour workday, and had unlimited push/pull capacity, other than the lift/carry weight limitations. Tr. 331.   Plaintiff should only occasionally stoop, kneel, crouch, crawl, or climb a ladder, rope, or scaffold, but had no manipulative, visual, communicative, or environmental limitations. Tr. 332-35.   On July 25, 2002, Dr. J. Scott Pritchard, D.O., affirmed the RFC assessment. Tr. 335.

On February 28, 2002, plaintiff was seen for an initial visit by Jeffrey T. Wang, M.D., for complaints of achiness in his neck, back, and left hip. Tr. 338-39, 342.   On physical examination, Dr. Wang noted that plaintiff had muscle spasms at the left trapezius muscle area and the left greater trochanteric area.   Tr. 339.   Dr. Wang ordered x-rays of the left hip, pelvis, and cervical, thoracic and lumbar spine, and recommended physical three times a week for six weeks, with follow up in one month.   Tr. 338-39.

On March 1, 2002, x-rays of the pelvis, hip, and spine revealed degenerative changes in the cervical and lumbar spine, but no degenerative changes in the left hip.   Tr. 341-42.

At a follow-up visit with Dr. Wang on March 28, 2002, plaintiff's cervical spine was non-tender with left posterior spasms.   Tr. 338.   He reported continued pain and requested Vicodin

5 - FINDINGS & RECOMMENDATION

to help with pain relief.  Id.  Dr. Wang reviewed the recent x-rays and opined that plaintiff's left hip pain was from greater trochanteric bursitis, since the x-rays were negative for degenerative disease.  Tr. 337.  Dr. Wang continued plaintiff's Robaxin prescription for back spasms and referred plaintiff to the Salem Rehabilitation Clinic.  Id.

On May 29, 2002, plaintiff presented at urgent care for vomiting, diarrhea, and fever.  Tr. 606.  Examining physician Dr. Pamela Bird, D.O., referred plaintiff to the emergency room for IV therapy and further evaluation and treatment.  Id.

On September 19, 2003, plaintiff was referred for physical therapy sessions three times a week for six weeks.  Tr. 375, 764. He participated in three sessions, but the funding for the treatment was discontinued.  Tr. 374-82, 752-61.

On November 18, 2003, plaintiff presented at urgent care for complaints of back shoulder and neck pain.  Tr. 384, 605.  He was evaluated by Dr. Harvey B. Price, M.D., who noted that when he attempted to perform a physical examination, plaintiff became angry and stated that he just wanted something for his pain.  Id.  When Dr. Price refused to prescribe a narcotic, plaintiff left without signing out, leading Dr. Price to note that he believed plaintiff was engaged in "probable drug seeking behavior."  Id.

On January 12, 2004, DDS physician Dr. Linda Jensen, M.D., completed a physical RFC assessment, concluding that plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk with normal breaks for six hours in an eight hour workday, sit with normal breaks for approximately six hours in an eight hour workday, and had unlimited push/pull

capacity, other than the lift/carry weight limitations. Tr. 610.
Plaintiff had no postural, manipulative, visual, communicative, or
environmental limitations.  Tr. 611-13.

On January 13, 2004, plaintiff saw Dr. Salvador Ortega, M.D.,
for an initial visit.  Tr. 633.  Dr. Ortega noted that plaintiff
was emotionally labile, was living out of his car, and did not want
to take narcotics.  Id.

On February 5, 2004, plaintiff presented at the emergency room
for complaints of shoulder pain and swelling in his fingers.  Tr.
410-20.  Plaintiff reported that he had been treated with narcotics
for pain in the past, but that he "does not like narcotics."  Tr.
414-15.  He was provided Naprosyn for pain relief and a sling to
wear in the event that the pain worsened.  Tr. 416.

At a follow-up visit with Dr. Ortega on February 11, 2004,
plaintiff was still experiencing chronic back pain and right
shoulder pain.  Tr. 632.  On physical examination, plaintiff's
range of motion was decreased on lateral abduction, but he was able
to fully extend, despite his pain complaints.  Id.  Dr. Ortega
thought physical therapy would be helpful and noted that plaintiff
was "very much interested in this modality."  Id.

On February 19, 2004, Dr. John Lees, M.D., examined plaintiff,
noting several areas of tenderness.  Tr. 620.  He ordered a series
of x-rays, which were taken the same day.  Tr. 74-76, 620, 623-25.
Cervical spine x-rays revealed marginal ossific spur formation at
C3 to C7 with moderate to large spurs at C5-6 and moderate disc
height loss at C5-6 and C6-7.  Tr. 74, 623.  Right shoulder x-rays
revealed some possibility of chronic supraspinatus tendon
inflammation.  Tr. 75, 624.  Lumbar spine x-rays revealed evidence

7 - FINDINGS & RECOMMENDATION

of moderate degenerative disc changes.  Tr. 76, 625.

Dr. Lees next examined plaintiff on March 17, 2004, noting that plaintiff reported persistent pain in his back and shoulder. Tr. 619.  At their next visit on April 13, 2004, Dr. Lees noted that plaintiff had been experiencing difficulty sleeping due to pain.  Tr. 618.  Dr. Lees refilled plaintiffs' prescriptions and ordered an MRI.  Id.

On April 14, 2004, a lumbar spine MRI revealed advanced multilevel degenerative changes including prominent central disc bulge and protrusion at L4-5 and L5-S1.  Tr. 72-73, 621-22.

On April 29, 2004, DDS physician Dr. Sharon Eder, M.D., completed a physical RFC assessment, concluding that plaintiff could occasionally lift or carry 50 pounds, frequently lift 25 pounds, stand or walk with normal breaks for six hours in an eight hour workday, sit with normal breaks for approximately six hours in an eight hour workday, and had unlimited push/pull capacity, other than the lift/carry weight limitations.  Tr. 386.  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  Tr. 387-89.  Dr. Eder attributed the symptoms to a medically determinable impairment, but thought the severity of the impairment was disproportionate to the expected severity.  Tr. 389. The same day, DDS physician Dr. Robert Henry, Ph.D, conducted a psychiatric review technique, concluding that plaintiff has a non-severe medical impairment due to chronic use of marijuana. Tr. 391-400.  He concluded that plaintiff has no functional limitations. Tr. 401.

On May 1, 2004, an MRI of plaintiff's right shoulder revealed possible articular surface tear of the supraspinatus tendon and

8 - FINDINGS & RECOMMENDATION

probable tendinosis/tendinopathy.  Tr. 872-73.

In June 2004, plaintiff returned to the emergency room several times for complaints of vomiting and nausea.  Tr. 421-52.  On June 12, 2004, shortly after being admitted to the hospital from the emergency room, plaintiff reported feeling much better and requested discharge.  Tr. 427, 437, 473.  Plaintiff returned to the emergency room the following morning with continued nausea and vomiting and was readmitted to the hospital for treatment of nausea and possible colitis.  Tr. 474-552.  Urinalysis revealed that plaintiff was positive for opiates and marijuana.  Tr. 504.  On the third day, plaintiff left the hospital against medical advice.  Tr. 480, 552.

On January 6, 2005, plaintiff's treating physician Dr. Lees, provided his medical opinion regarding plaintiff's ability to perform physical work-related activities.  Tr. 567-70.  Dr. Lees concluded that plaintiff could occasionally lift or carry less than ten pounds, could frequently lift or carry ten pounds on an intermittent basis, could stand or walk with normal breaks for less than two hours in an eight hour day, and could sit with breaks to stretch for about four to eight hours out of an eight hour day. Tr. 567.  Dr. Lees further concluded that plaintiff would need to periodically alternate between sitting, standing, and walking to relieve discomfort.  Tr. 568.  He would need to change positions every 20 to 30 minutes when sitting, every 15 to 20 minutes when standing, and would need to walk around every 30 minutes for approximately five minutes at a time.  Tr. 568.  Plaintiff could only occasionally twist, and never stoop, bend, crouch, or climb stairs or ladders.  Id.  Dr. Lees noted that plaintiff's ability to

9 - FINDINGS & RECOMMENDATION

reach and to push/pull was affected by his impairment, but handling, fingering, and feeling were unaffected.  Id.  Plaintiff should avoid all exposure to hazards and extreme heat and cold, avoid even moderate exposure to wetness, and avoid concentrated exposure to humidity, noise, fumes, odors, dusts, gases, and poor ventilation.  Id.  Finally, Dr. Lees opined that plaintiff would miss work an average of one day a month due to his impairments. Tr. 570.

On March 7, 2005, Dr. Josh Jones, M.D., examined plaintiff, noting that while he was alert and communicative, he had a "sad affect" and he appeared to experience discomfort when moving and walked with some limitation.  Tr. 773.  At a follow-up visit on April 22, 2005, Dr. Jones noted that plaintiff was not experiencing any problems with his pain medication.  Tr. 772.

On April 28, 2005, plaintiff was evaluated at the Legacy Bone Clinic for right shoulder pain.  Tr. 838-41.  Plaintiff reported that his pain was an eight out of ten.  Tr. 838.  On physical examination, his range of motion was very limited, he had diffuse tenderness, and expressed pain with all movement.  Tr. 840.

On May 5, 2005, plaintiff had several MRIs at the request of Dr. Jones.  Tr. 70-71, 774-75.  An MRI of the cervical spine revealed moderate to extensive degenerative disc changes at C5-6 and C6-7, but no evidence of nerve root impingement.  Tr. 70, 774. The MRI of the thoracic spine revealed mild degenerative disc changes with diffuse concentric bulging of the annulus at T7-8 and T10-11 and a faint small syrinx at T2-3.  Tr. 71, 775.  Finally, the right shoulder findings suggested a partial tear of the distal supraspinatus tendon.  Id.

10 - FINDINGS & RECOMMENDATION

On May 18, 2005, licensed clinical social worker Kenneth C. Stanley performed a mental health assessment of plaintiff at the request of plaintiff's treating physician Dr. Jones. Tr. 768-71. Stanley diagnosed plaintiff with adjustment disorder with depressed mood and pain disorder associated with psychological factors and a general medical condition. Tr. 769-71.

On June 13, 2005, Dr. Jones referred plaintiff to an orthopedic clinic for evaluation for surgery on his right shoulder, based upon the most recent MRI findings. Tr. 767. A chart note dated July 29, 2005, indicates that only an evaluation would be covered, and if plaintiff needed surgery, he would have to obtain charity care. Tr. 815.

On August 1, 2005, Dr. Jones wrote a letter to the Social Security Administration, clarifying that plaintiff had been treated first by Dr. Lees, and then by himself, at the NARA Indian Health Clinic since February 2004 for chronic neck and back pain as well as severe degenerative disc disease of the cervical spine and right shoulder. Tr. 688, 766. Dr. Jones opined that plaintiff is incapacitated by his cervical spine degenerative disc disease, as reflected in the May 5, 2005 MRI, and thought that "disability status would be warranted." Id. Dr. Jones noted that plaintiff had tried multiple pain modalities in the past, which were no longer effective, resulting in regular hydrocodone and medical marijuana use. Id. Dr. Jones further noted that he found plaintiff to be "cooperative and reliable" and "never had any concerns about inappropriate use of the narcotics he receives." Id.

Dr. Jones saw plaintiff on October 10, 2005, at which time he

11 - FINDINGS & RECOMMENDATION

deferred physical examination, noting that despite plaintiff's low back pain being stable, plaintiff reported that it was still fairly debilitating.  Tr. 811.  Plaintiff reported experiencing some benefit from swimming.  Id.  Dr. Jones continued his medications, noting that they "appear to be adequate."  Id.  At their next visit on December 5, 2005, Dr. Jones noted only that the pain medication appeared to be "reliable" and again deferred physical examination.  Tr. 810.

On February 13, 2006, Dr. Jones examined plaintiff, noting that his pain was stable on his narcotic regimen and that he was sleeping well.  Tr. 58, 808.

On April 23, 24, 25, and 27, 2006, plaintiff presented at the emergency room for nausea and vomiting.  Tr. 844-53, 856-57, 858-59, 860-64.  At that time, plaintiff was taking Lovastatin, Trazodone, Quinine Sulfate, Vicodin, and Albuterol.  Tr. 845.

At a follow-up visit with Dr. Jones on May 8, 2006, plaintiff reported increased pain and that he had been hospitalized for vomiting and dehydration.  Tr. 55, 802.  Dr. Jones noted that plaintiff had mild tenderness over his cervical spine and did not seem to be as cheerful as he had previously.  Id.

On May 25, 2006, Dr. May Wang, M.D., noted that plaintiff reported increased pain and difficulty sleeping.  Tr. 54, 802.  She suggested that he consider a long lasting narcotic, and prescribed morphine, with follow up in one week.  Id.  On June 1, 2006, plaintiff reported that he did not tolerate the morphine, as it made him too itchy and caused constipation.  Tr. 53, 800.

Dr. Wang saw plaintiff for continued complaints of pain on June 15, 2006, but a note dated June 17, 2006, reveals that he

12 - FINDINGS & RECOMMENDATION

changed physicians shortly thereafter.  Tr. 51-52, 798-99.

On June 30, 2006, plaintiff was seen by Dr. Jessie Burness, M.D., who removed an apparent lipoma from his left forearm and indicated that his narcotic pain contract would be reviewed in 30 days.  Tr. 50, 796.

On July 26, 2006, Dr. Burness noted that plaintiff's back and shoulder pain was increasing and that he had tried acupuncture with no success.  Tr. 48, 793.  She deferred the physical examination until the next visit and ordered an MRI.  Id.  She noted that the pain contract did not allow any additional medications at that time, but opined that plaintiff might benefit from a change to a low acting narcotic.  Id.

An August 2, 2006, thoracic spine MRI revealed minimal degenerative changes at T2-3, T6-7, and T9-10, and the previously identified syrinx was not reliably identified.  Tr. 69, 822, 825. There was an apparent increased transverse diameter of the trachea, for which chest x-rays were recommended in order to establish whether the diameter was normal.  Id.  Follow up chest x-rays revealed mild tracheal widening, which Dr. Burness discussed with plaintiff at their next meeting.  Tr. 44, 68, 821.

Dr. Burness ordered a right shoulder MRI on August 24, 2006, which revealed chronic distal supraspinatus tendon tear with increasing degenerative changes and possible internal tearing.  Tr. 869-70.

On August 30, 2006, plaintiff was seen by an orthopedist at the Legacy Bone Clinic, who noted that on physical examination, his shoulder was tender and his range of motion was limited by pain. Tr. 835-36.  He was assessed with subracomial bursitis and

13 - FINDINGS & RECOMMENDATION

1   tendonitis of the supraspinatus in his right shoulder.  Tr. 837.

2      On September 6, 2006, Dr. Burness noted that plaintiff had

3   seen an orthopedist, who recommended shoulder surgery.  Tr. 46,

4   790.  She also noted that ideally, plaintiff should be on a longer

5   acting medication, but did not tolerate methadone and did not want

6   to take Oxycontin.  Id.

7      At a visit with Dr. Burness on November 1, 2006, plaintiff

8   expressed increased pain due to the cold weather and also that he

9   was wiling to try long-acting morphine.  Tr. 42, 829.  Dr. Burness

10  prescribed long-acting morphine and additional medication for

11  breakthrough pain to ease the transition.  Id.

12     On November 14, 2006, plaintiff presented to the emergency

13  room in a wheelchair, complaining that he fell off a ladder.  Tr.

14  865-57.  After physical examination and spinal x-rays, he was

15  diagnosed with contusion of the buttocks and right hip and chronic

16  low back pain secondary to degenerative disc disease.  Id.  He was

17  discharged in good condition.

18     At his next visit with Dr. Burness on December 4, 2006,

19  plaintiff expressed that his pain had increased dramatically with

20  the switch to morphine, so Dr. Burness returned him to his previous

21  medication regimen.  Tr. 41, 828.  He had also followed up with the

22  orthopedist, who recommended cortisone injections rather than

23  surgery, because the shoulder appeared to be healing on its own.

24  Tr. 41.

25     On January 4, 2007, Dr. Burness noted that plaintiff reported

26  worsening pain, but that he did not want an increase in pain pills.

27  Tr. 40, 827.  He wanted to start swimming or doing water aerobics

28  because other exercise was too painful and his insurance denied

14 - FINDINGS & RECOMMENDATION

multiple physical therapy referrals. Id.  He reported that his shoulder pain was improving.  Id.  Dr. Burness noted that plaintiff is not a surgical candidate for his back pain and they discussed the possibility of paying out of pocket for physical therapy if finances improved. Id.

On March 5, 2007, plaintiff reported that his pain had intensified for the previous few months, especially in his thoracic spine at night. Tr. 36. Dr. Burness increased his pain medication and requested follow-up in one month.  Id.  Dr. Burness was unable to make the scheduled follow up appointment on April 4, 2007, but the doctor who examined plaintiff noted that he appeared "anxious" and renewed his pain prescription.  Tr. 34.

At his next visit with Dr. Burness on April 12, 2007, plaintiff expressed that he was experiencing increased pain, headaches, neck, knee, hip, and ankle pain, joint swelling, bilateral thumb pain, and depression.  Tr. 33.  On physical examination, plaintiff's back was tender throughout the thoracic spine region, but he had full range of motion.  Id.  Dr. Burness ordered x-rays of plaintiff's spine and thumbs, and noted that she believed plaintiff was depressed.  Id.

X-rays taken on April 26, 2007, revealed early degenerative changes in plaintiff's thumb as well as multilevel degenerative changes in his cervical spine.  Tr. 67.  Thoracic spine x-rays taken on May 2, 2007, revealed a normal thoracic spine.  Tr. 66.

On May 5, 2007, Dr. Burness discussed the x-ray results with plaintiff and noted that he had inflammatory arthritis and recommended referral to a rheumatologist for evaluation. Tr. 31.

On May 9, 2007, plaintiff was evaluated by Dr. Ronald C.

15 - FINDINGS & RECOMMENDATION

Fraback, M.D., for a rheumatology consultation. Tr. 884-85.  After performing a physical examination and reviewing plaintiff's laboratory results, Dr. Fraback assessed plaintiff with back and neck musculoskeletal pain and moderately advanced degenerative changes in the lumbar and cervical spine.  Tr. 885.  He opined that the back and neck pain is "likely mechanical," but recommended that plaintiff be screened for spondyloarthropathy.  Id.

On June 15, 2007, plaintiff reported that he had been unable to follow up with the rheumatologist because had lost his insurance at the end of May.  Tr. 26.  Dr. Burness noted that plaintiff was experiencing extreme dizziness when standing up and was also experiencing heart palpitations.  Id.  She recommended that plaintiff log his symptoms over the next month and considered that plaintiff might need a cardiac monitor in the future.  Id.  She also ordered repeat x-rays of plaintiff's hip.  Id.

X-rays taken on June 21, 2007, showed no abnormalities in plaintiff's right hip, though a bone island in plaintiff's right femoral neck was observed.  Tr. 65.  There was marked degenerative disc disease at L4-5.  Id.

On July 26, 2007, plaintiff reported that he had experienced dizziness episodes only twice since his last visit, though he was still having occasional heartburn and nausea.  Tr. 1037.  Dr. Burness continued his medications.  Id.

At his next visit on August 27, 2007, plaintiff reported that the heartburn medication was helping some but not enough.  Tr. 1036.  By his October 30, 2007, appointment with Dr. Wang, he appeared to have stabilized.  Tr. 1033.

On December 5, 2007, plaintiff began seeing Nurse Anderson on

16 - FINDINGS & RECOMMENDATION

a regular basis.  Tr. 1016-1032.  During his visit on January 30, 2008, Nurse Anderson noted that plaintiff reported that his pain was increasing, and he was finding it increasingly difficult to sleep.  Tr. 1030.

During her physical examination of plaintiff of March 3, 2008, Nurse Anderson noted that he was "in obvious pain."  Tr. 1028.  On May 5, 2008, plaintiff was still reporting pain and difficulty sleeping, but Nurse Anderson noted that he was working on increasing walking so as to lose weight. Tr. 1025.

On June 2, 2008, plaintiff was homeless, living out of his vehicle, and unable to find work due to his prescription narcotic use.  Tr. 1023.  He was experiencing side effects from the Oxycodone and had become resistant to the Norco, so Nurse Anderson started him on morphine.  Id.

Plaintiff saw Dr. Freitag on July 15, 2008, for complaints of vomiting and diarrhea on and off for the previous week.  Tr. 1022. During visits with Nurse Anderson for the remainder of 2008, plaintiff reported continuing pain and experiencing mild side effects.  Tr. 1016-21.

On March 23, 2009, Nurse Anderson began completing an opiod analgesic reassessment form. Tr. 1076-77. At that time, plaintiff was taking Norco and Neurontin for daily pain that plaintiff estimated to be an eight of ten.  Tr. 1076.  Plaintiff reported that his physical functioning, family and social relationships, mood, sleep patterns, and overall functioning were worse since his last visit, but thought that the pain relief he was currently obtaining was enough to make a real difference in his life.  Id. He reported no adverse side effects and Nurse Anderson did not

17 - FINDINGS & RECOMMENDATION

believe plaintiff was exhibiting any signs of potentially aberrant drug-related behavior.  Tr. 1077.

On April 29, 2009, Nurse Anderson completed an opiod analgesic reassessment form.  Tr. 1069-71.  At that time, plaintiff was taking Norco daily for pain that plaintiff estimated to be an eight of ten.  Tr. 1076.  Plaintiff reported that his physical functioning, family and social relationships, mood, and overall functioning were the same since his last visit, and thought that the pain relief he was currently obtaining was enough to make a real difference in his life.  Id.  He reported experiencing moderate constipation as a side effect to his medication.  Tr. 1071.  Nurse Anderson noted that plaintiff had no aberrant drug-related behavior and indicated that she thought he was benefitting from opiod therapy.  Id.  Nurse Anderson completed another form on May 27, 2009, at which time plaintiff reported that his pain was slightly better, but all other responses were the same.  Tr. 1066-68.

The last opiod analgesic reassessment form that appears in the record was completed on July 2, 2009, at which time plaintiff reported that all other activities of daily living were the same, his pain was a little better than it had been, he was experiencing no side effects, but he was depressed.  Tr. 1064-65.  Nurse Anderson did not believe plaintiff was exhibiting any signs of potentially aberrant drug-related behavior and thought it best to continue with his present regimen of Norco and neurontin.  Id.

/ / /

/ / /

/ / /

1  II.  Plaintiff's Testimony

2      A.  Written Testimony

3      In an Adult Function Report completed on December 17, 2001,
4  plaintiff reported that he suffers from severe degenerative disc
5  disease, arthritis, and carpal tunnel, which limit his ability to
6  work because he cannot lift, bend over, or twist.  Tr. 158-59.

7      In a series of reports dated February 4, 2002, plaintiff
8  detailed his pain, limitations, and activities of daily living.
9  Tr. 181-198.  Plaintiff reported that he was experiencing constant
10  aching, burning, and stinging pain between his lower back and neck.
11  Tr. 181.  All activities caused the pain, but bending and lifting
12  made it worse.  Id.  When his back was "out," the pain could be
13  aggravated by something as simple as a cough.  Id.  Depending on
14  the severity of his pain, plaintiff took Vicodin and Robarin daily,
15  but experienced side effects such as itching, upset stomach, and
16  interference with his eating and sleeping habits.  Tr. 182.  At
17  that time, plaintiff could take care of his personal needs, cook
18  his own meals,  perform household chores, handle his finances, and
19  do his own grocery shopping. Tr. 183-87.  He spent most of his time
20  watching television or listening to the radio, golfing when the
21  pain permitted, but could no longer engage in his other hobbies,
22  such as skiing, kung fu, and repelling.  Tr. 187-88.

23      In a series of reports completed in December 2003, plaintiff
24  reported that he was living alone in his car, his pain was getting
25  worse, he was eating mostly sandwiches since he no longer had a
26  place to cook, and did not engage in any activities other than
27  watching television or listening to the radio.  Tr. 264-70.  His
28  pain was still constant, aggravated by pretty much anything, but

19 - FINDINGS & RECOMMENDATION

was helped by pain medications.  Tr. 271-72.

In a Function Report completed on November 26, 2003, plaintiff reported that his back is so bad that he is unable to walk, sit, lift, turn, or stand, and that he occasionally gets stuck in a "bent over" position, sometimes lasting as long as six weeks.  Tr. 233-34. He was also having difficulty with his right rotator cuff. Tr. 237.  At that time, he was taking Vicodin, Methadone, and Morphine for pain, Escitalopram for depression, Lovastatin for cholesterol, and Trazadone to help him sleep.  Tr. 239, 241.

In reports dated April 2004, plaintiff reported that he was still experiencing a constant aching, stinging pain that was made worse by pretty much any activity, that he was taking Vicodin two to four times a day, but was experiencing side effects.  Tr. 209-10.  He could be active for three to four hours before needing to rest, could take walks occasionally depending on pain, and needed help completing tasks such as laundry, cleaning, and shopping.  Tr. 210.  At that time, he was living in his car and eating only prepared or canned foods.  Tr. 211.  He reported that his pain affects all his activities.  Tr. 212-14.

B.  Hearing Testimony

Plaintiff testified at the first hearing, held on May 23, 2005.  At that time, he stated that his back "collapses" on him, causing him to "get stuck bent over" for two to six weeks at a time.  Tr. 900.  He stated that "just about anything" will throw his back out, and he can't do any of the activities he used to enjoy, such as kung fu, skiing, and golfing.  Id.  He could only sit, stand, or lay down, and could not do any of those movements for very long.  Id.  Plaintiff testified that he suffers from

20 - FINDINGS & RECOMMENDATION

carpal tunnel syndrome, which causes hands to "bind up" if he grabs something wrong or applies too much pressure to his hands.  Tr. 901-02.  If he is feeling good, he will go for a walk, though he is unable to walk very far.  Tr. 921-22.

At the hearing held on January 11, 2007, plaintiff testified that cortisone shots cause him to pass out.  Tr. 945.  He also testified to a myriad of side effects from his medications, including several hospitalizations for nausea and vomiting.  Tr. 946-50.  His back felt inflamed all the time, and would totally "go out" three to four times a year.  Tr. 952.

At the most recent hearing on August 21, 2009, plaintiff testified that since the last hearing, his condition had worsened, as he has more pain and less mobility.  Tr. 1104-05.  He said that his daily routine consists of alternating between sitting, walking, and laying down, depending on his pain level.  Tr. 1105.  He can only stand or walk for an hour at most, and he cannot drive for more than an hour before his back starts to hurt and he has to pull over, walk around, and stretch.  Tr. 1106.  He is lucky to have one good day a month, and even then, his pain level is a seven out of ten.  He has difficulty performing tasks that require lifting, such as showering, getting dressed, and shopping.  Tr. 1109.

## THE ALJ'S DECISION

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through June 30, 2000.  Tr. 969.  Because plaintiff did not appeal the denial of his previous disability application, and because plaintiff presented no new and material evidence justifying reopening that application, the ALJ determined that plaintiff's onset date is July 29, 2002.  Id.  Any

21 - FINDINGS & RECOMMENDATION

references to medical or other evidence prior to that date were only for the purposes of establishing the nature and extent of plaintiff's impairments and addressing credibility.  Id.

The ALJ found that plaintiff had not engaged in substantial gainful activity since July 29, 2002.  Id.  He found that plaintiff has the following severe impairments: cervical degenerative changes at C5-7 with osteophyte formation at C5-6 and L5-S1 lumbar degenerative changes with bulges, right shoulder inflammation, and a tear of the supraspinatus tendon.  Tr. 969-70.  The ALJ determined that plaintiff's impairments did not meet or equal, either singly or in combination, a listed impairment.  Tr. 972.

The ALJ determined that plaintiff had the RFC to perform light work, to lift and/or carry twenty pounds occasionally and ten pounds frequently, to sit or stand with the option to change positions at will, reach overhead occasionally, and stoop, crawl, crouch or climb occasionally.  Tr. 972.  He should avoid concentrated exposure to hazards such as heights or moving machinery.  Id.  Finally, his pain limits him to performing unskilled tasks.  Id.

In forming this RFC, the ALJ found plaintiff's allegations of disability not credible, and rejected the opinions of Drs. Lees and Jones, who opined that plaintiff is disabled and unable to perform full time work.  Tr. 972-73.  The ALJ rejected their opinions because they were not supported by the objective evidence in the record which shows that plaintiff's limitations are not severe enough to support a limitation of all work.  Tr. 973.  The ALJ also rejected Drs. Lees and Jones' opinions because the record is devoid of examinations of plaintiff.  Id.

22 - FINDINGS & RECOMMENDATION

1    In rejecting plaintiff's account of the severity of his
2    impairments, the ALJ noted that plaintiff's treatment history and
3    the objective evidence does not support the severity of limitations
4    alleged. Tr. 973-74. The ALJ further remarked that plaintiff's
5    activities of daily living further undermine his credibility. Tr.
6    975.

7    Based on this RFC, the ALJ determined that plaintiff could not
8    perform his past relevant work, but that he could still perform
9    jobs existing in significant numbers in the national economy. Tr.
10   976-77. Relying on the Medical-Vocational Guidelines and VE
11   testimony, the ALJ found that plaintiff could perform the jobs of
12   inventory assistant and hardware assembler, which exist in
13   significant numbers in the economy. Tr. 977. Accordingly, the ALJ
14   found plaintiff not disabled. Id.

15              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

16   A claimant is disabled if unable to "engage in any substantial
17   gainful activity by reason of any medically determinable physical
18   or mental impairment which . . . has lasted or can be expected to
19   last for a continuous period of not less than 12 months[.]" 42
20   U.S.C. § 423(d)(1)(A). Disability claims are evaluated according
21   to a five-step procedure. Baxter v. Sullivan, 923 F.2d 1391, 1395
22   (9th Cir. 1991). The claimant bears the burden of proving
23   disability. Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir.
24   1989). First, the Commissioner determines whether a claimant is
25   engaged in "substantial gainful activity." If so, the claimant is
26   not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20
27   C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner
28   determines whether the claimant has a "medically severe impairment

23 - FINDINGS & RECOMMENDATION

1  or combination of impairments." <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u>
2  20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not
3  disabled.

4      In step three, the Commissioner determines whether the
5  impairment meets or equals "one of a number of listed impairments
6  that the [Commissioner] acknowledges are so severe as to preclude
7  substantial gainful activity." <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20
8  C.F.R. §§ 404.1520(d), 416.920(d).  If so, the claimant is
9  conclusively presumed disabled; if not, the Commissioner proceeds
10 to step four. <u>Yuckert</u>, 482 U.S. at 141.

11     In step four the Commissioner determines whether the claimant
12 can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e),
13 416.920(e).  If the claimant can, he is not disabled.  If he cannot
14 perform past relevant work, the burden shifts to the Commissioner.
15 In step five, the Commissioner must establish that the claimant can
16 perform other work. <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§
17 404.1520(e) & (f), 416.920(e) & (f).  If the Commissioner meets its
18 burden and proves that the claimant is able to perform other work
19 which exists in the national economy, he is not disabled.  20
20 C.F.R. §§ 404.1566, 416.966.

21     The court may set aside the Commissioner's denial of benefits
22 only when the Commissioner's findings are based on legal error or
23 are not supported by substantial evidence in the record as a whole.
24 <u>Baxter</u>, 923 F.2d at 1394.  Substantial evidence means "more than a
25 mere scintilla," but "less than a preponderance." <u>Id.</u>  It means
26 such relevant evidence as a reasonable mind might accept as
27 adequate to support a conclusion. <u>Id.</u>
28 / / /

24 - FINDINGS & RECOMMENDATION

1                           DISCUSSION

2       Plaintiff asserts that the ALJ's decision should be reversed

3  and remanded for an award of benefits because it is not supported

4  by substantial evidence and contains errors of law.  In particular,

5  plaintiff contends that the ALJ erred by failing to find that

6  plaintiff's depression is a severe impairment, failing to consider

7  whether plaintiff's impairments equaled Listing 1.04, improperly

8  rejecting the opinions of plaintiff's treating physicians, and

9  conducting an incomplete assessment of plaintiff's RFC.

10 I.  Step Two: Severe Impairment

11      Plaintiff argues that the ALJ failed by not finding his

12 depression a severe impairment.  Defendant argues that substantial

13 evidence supports the ALJ's conclusion that plaintiff's depression

14 was non-severe.

15      The ALJ considers the severity of the claimant's impairment(s)

16 at step two.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

17 If the claimant does not have a severe medically determinable

18 physical or mental impairment that meets the duration requirement,

19 or a combination of impairments that is severe and meets the

20 duration requirement, the claimant is not disabled.  Id.

21      A severe impairment is one that significantly limits the

22 claimant's physical or mental ability to do basic work activities.

23 20 C.F.R. §§ 404.1520(c), 416.920(c).  "Basic work activities" are

24 the abilities and aptitudes necessary to do most jobs, including

25 physical functions such as walking, standing, sitting, lifting,

26 etc.  20 C.F.R. §§ 404.1521(b), 416.921(b).  In Social Security

27 Ruling (SSR) 96-3p (available at 1996 WL 374181, at *1), the

28 Commissioner has explained that "an impairment(s) that is 'not

severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."

The Ninth Circuit has explained that the step two severity determination is expressed "in terms of what is 'not severe.'" Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). The ALJ is required to consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity. Id. Importantly, as the Ninth Circuit noted, "the step-two inquiry is a de minimis screening device to dispose of groundless claims." Id. (citing Yuckert, 482 U.S. at 153-54).

"[T]he severity regulation is to do no more than allow the [Social Security Administration] to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working." SSR 85-28 (available at 1985 WL 56856, at *2) (internal quotation omitted). Therefore, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (quoting SSR 85-28). The court's task in reviewing a denial of benefits at step two is to "determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." Id.

At step two, the ALJ found that plaintiff has the combined severe impairments of cervical and lumbar degenerative changes and right shoulder inflammation and supraspinatus tendon tear. Tr. 970. Plaintiff alleges the ALJ failed to incorporate his

26 - FINDINGS & RECOMMENDATION

depression as a severe impairment because the ALJ conducted an inaccurate analysis of the "B" criteria. Specifically, plaintiff takes issue with the fact that the ALJ classified his activities of daily living restrictions as only "mild," based largely on old testimony that does not take into account that plaintiff's condition has worsened.

In support of his conclusion that plaintiff's depression has not manifested in a significant degree of limitation under any of the paragraph "B" functional areas, the ALJ relied upon a Psychiatric Review Technique form, which demonstrates that plaintiff is able to perform self-care activities, household chores, yard work, prepare his own meals, and shop for food. Tr. 971. The record supports this characterization, (See Tr. 183-87, 210), but also indicates that at times, plaintiff was quite limited in his self-care abilities (See Tr. 267-70, 921-22). The more recent hearing testimony provided by plaintiff at his hearings in 2005, 2007, and 2009, reflect that his condition has worsened. However, because plaintiff does not challenge the ALJ's adverse credibility determination which was based in part upon these same accounts of an active lifestyle, there is no reason to disturb the ALJ's finding here regarding self-care activities.

Moreover, in determining that plaintiff does not suffer from any severe mental impairments, the ALJ did not rely solely upon his characterization of plaintiff's activities of daily living. The ALJ also relied upon medical evidence, finding significant that plaintiff has never sought mental health counseling, he has never required hospitalization, and demonstrates few symptoms of mental impairment. Tr. 970. The ALJ also relied upon a 2005 mental

27 - FINDINGS & RECOMMENDATION

status evaluation performed by Kenneth Stanley, a social worker at plaintiff's primary care facility.  Id.  Stanley found that while plaintiff experienced some mild symptoms of depression and insomnia and some difficulty in social, occupational, and school functioning, he thought plaintiff generally functions pretty well. Tr. 971.  The state agency consultant also found non-severe impairments, no functional limitations, and no consistent disturbance of mood or mental or social functioning.  Tr. 401.

With the exception of Stanley's mental status evaluation, plaintiff's medical record is entirely devoid of any mental health records or mental health treatment.  Despite seeing his physicians on a monthly basis for many years, there is not a single mention of plaintiff's need for counseling or other psychological treatment. With the exception of Dr. Burness' April 12, 2007, note that she thought plaintiff might be "depressed" and a few scattered notations over the years that plaintiff was "emotionally labile," had a "sad affect," "was not as cheerful," and appeared "anxious,"there is no evidence in the record that plaintiff suffered from depression or any other mental impairment. Tr. 34, 55, 611-13, 773, 802.  There is no suggestion of any mental limitations on plaintiff's ability to perform basic work activities.  Accordingly, the ALJ had substantial evidence to find that the medical evidence clearly established that plaintiff's depression was not a severe impairment.  Remand is not warranted on this issue.

II.  Listing 1.04

Plaintiff contends that the ALJ erred by failing to find that he met Listing 1.04.  At step three of the sequential analysis, the

28 - FINDINGS & RECOMMENDATION

ALJ must determine whether the claimant's impairments meet or equal any of the listed impairments considered so severe as to automatically constitute disability.  20 C.F.R. §§ 404.1594(c)(3), 404.1520(d).  The Listing of Impairments describes impairments that the Commissioner considers "to be severe enough to prevent an individual from doing any gainful activity," regardless of age, education or work experience.  20 C.F.R. § 404.1525(a).  Thus, a claimant is disabled if his or her impairment meets or is equivalent to a listed impairment. 20 C.F.R. § 404.1520(a)(4)(iii). An impairment is the equivalent of a listed impairment if the claimant establishes "symptoms, signs, and laboratory findings at least equal in severity and duration to the characteristics of a relevant listed impairment." Tackett, 180 F.3d at 1099 (internal citation omitted).

Plaintiff contends that the ALJ failed to conduct a full analysis of equivalence.  Listed Impairment 1.04 addresses musculoskeletal spinal disorders.  As explained in the regulation, in order to meet or equal the listing, a claimant must have:

> 1.04. Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable

29 - FINDINGS & RECOMMENDATION

1     imaging, manifested by severe burning or
painful dysesthesia, resulting in the need for

2     changes in position or posture more than once
every 2 hours; or

3

     C. Lumbar spinal stenosis resulting in

4     pseudoclaudication, established by findings on
appropriate medically acceptable imaging,

5     manifested by chronic nonradicular pain and
weakness, and resulting in inability to

6     ambulate effectively, as defined in 1.00B2b.

7 20 C.F.R Pt. 404, Subpt. P, App. 1.

8  The ALJ specifically stated that while plaintiff suffers from

9 cervical and lumbar degenerative disc disease, he does not meet

10 Listing 1.04 because the medical records contain no evidence of

11 nerve root compression, spinal arachnoiditis, or lumbar spinal

12 stenosis. Tr. 972. The record supports this conclusion. None of

13 the many MRIs revealed anything other than degenerative changes and

14 bulges. Tr. 69-73, 320, 621-22, 774, 822, 825. In fact, the May

15 5, 2005, MRI revealed no evidence of nerve root impingement. Tr.

16 70, 774. Despite being repeatedly referred to specialists,

17 plaintiff was never recommended for surgery, or referred for any

18 other course of treatment more aggressive than physical therapy for

19 his spinal impairments. See Tr. 319-21, 328, 347-48, 374-82, 632,

20 752-61. The ALJ's characterization of the medical evidence

21 regarding the degree of limitation caused by plaintiff's spinal

22 impairments is accurately reflected in the record. The only

23 physicians who opined that plaintiffs' spine disorder made him

24 disabled were Dr. Jones and Dr. Lees, whose opinions were rejected

25 by the ALJ, as discussed more fully below.

26  To the extent that plaintiff objects on the grounds that the

27 ALJ did not consider his spinal impairments in combination with his

28 other impairments when determining whether he met a listing, this

30 - FINDINGS & RECOMMENDATION

argument is rejected.  Plaintiff cites <u>Lester v. Chater</u>, 81 F.3d 821, 829-30 (9th Cir. 1995) for the proposition that when a claimant's physical and mental impairments are "so inextricably linked," then the ALJ must consider their combined effect on the plaintiff's limitations when determining whether they meet or equal a listing.  81 F.3d at 829-30.  This principle is inapplicable here because as discussed above, none of plaintiff's impairments result in restrictions on his ability to function in the areas specified by paragraph B.  None of his impairments are "so inextricably linked" so as to require the court to consider their combined effect.  Moreover, the ALJ specifically considered whether plaintiff's other well documented physical impairments, his right shoulder inflammation and tendon tear, met or equaled the requirements of Listing 1.02.

Accordingly, the ALJ did not err by failing to perform a full analysis of equivalence at step three.  Thus, the ALJ's conclusion that plaintiff did not equal Listing 1.04 is not in error and remand on this issue is not warranted.

III.  Rejection of Treating Physician Opinions

Plaintiff contends that the ALJ improperly rejected the opinion of two of his treating physicians, Dr. Lees and Dr. Jones.

Social security law recognizes three types of physicians:  (1) treating; (2) examining; and (3) nonexamining.  <u>Lester</u>, 81 F.3d at 830.  Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant.  <u>Id.</u>

If the treating physician's opinion is not contradicted, the ALJ may reject it only for "clear and convincing" reasons.  <u>Id.</u>

31 - FINDINGS & RECOMMENDATION

1  Even if the treating physician's opinion is contradicted by another

2  doctor, the ALJ may not reject the treating physician's opinion

3  without providing "specific and legitimate reasons" which are

4  supported by substantial evidence in the record.  Id.

5      The ALJ rejected the opinions of two of plaintiff's primary

6  treating physicians, Dr. Lees and Dr. Jones, that plaintiff could

7  not sustain full-time employment.  Tr. 972.  Their opinions are

8  contradicted by three state agency physicians.  See 331-335, 386-

9  89, 609-14.  Thus, the ALJ must provide specific and legitimate

10 reasons supported by substantial evidence to reject Dr. Lees' and

11 Dr. Jones' opinions.

12     A. Dr. Lees

13     The ALJ gave several reasons for his rejection of Dr. Lees'

14 January 2005 opinion that plaintiff is unable to sustain even full

15 time sedentary work.  Tr. 972.  The ALJ rejected Dr. Lees' opinion

16 because plaintiff showed no correlating clinical signs to support

17 the environmental and postural limitations noted by Dr. Lees.  Tr.

18 973.  It appears as though the ALJ was referring to plaintiffs'

19 "conservative treatment," observing that he has been prescribed

20 pain medications,  but has received little else in the way of

21 treatment.  Tr. 974.  An ALJ may consider treatment as "an

22 important indicator of the intensity and persistence of

23 [claimant's] symptoms"  20 C.F.R. 416.929(c)(3).

24     Substantial evidence in the record supports the ALJ's finding

25 that there are no correlating clinical signs to support Dr. Lees'

26 opinion. Despite the voluminous medical record, plaintiff's course

27 of treatment over the years has consisted primarily of medication

28 management.  He saw his physicians on a regular, monthly basis,

32 - FINDINGS & RECOMMENDATION

according to the terms of his pain contract.  Despite these regular visits, the vast majority of the treatment notes relate the degree of plaintiff's reported pain and whether there was a medication adjustment.  Many visits were completed without an examination. With the exception of at times ordering x-rays and MRIs, the treatment notes are largely devoid of any other treatment or evaluation.  While plaintiff was referred to a few specialists for evaluation, this was mostly for his shoulder pain, and continued treatment was often foreclosed due to lack of insurance coverage. See Tr. 26, 884-85 (rheumatology referral);  767, 815 (referral to Orthopedic & Fracture Clinic for shoulder); 838-41 (evaluation at Legacy Bone Clinic for shoulder pain).    There are several discussions of physical therapy over the years, but no indication that plaintiff ever consistently engaged in a physical therapy regimen, other than three sessions in September 2003.  See Tr. 40, 632, 374-82, 752-61, 827.[1]

The ALJ also rejected Dr. Lees' opinion because there has been little, if any, progression in plaintiff's degenerative changes in the years since he gave his opinion.  Tr. 973.  The MRIs taken before Dr. Lees' January 2005 opinion revealed "advanced multilevel degenerative changes" of the lumbar spine.  Tr. 72-73, 621-22.

---

[1] In addressing plaintiff's course of treatment, the ALJ also discussed plaintiff's testimony regarding the limiting effects of his symptoms.  The ALJ ultimately found plaintiff non-credible because of evidence of an active lifestyle after the alleged onset date, and plaintiff has not raised this issue on appeal.  In any event, when a physician has relied on the subjective complaints of a properly discredited claimant , this can be a legitimate basis for disregarding that physician's opinions.  See Morgan v. Apfel, 169 F.3d 595, 602 (9th Cir. 1999).  ___

33 - FINDINGS & RECOMMENDATION

Subsequent x-rays and MRIs taken in May 2005, August 2006, and June 2007, continued to reveal the existence of degenerative changes in the thoracic and lumbar spine, though the characterization of the degree of change fluctuated, sometimes it was characterized as "normal" or "minimal", and sometimes as "marked," or "moderate to extensive." Tr. 70-71. 774-75. Given that plaintiff's treatment did not change in response to changes reflected in the MRIs and x-rays other than to modify his pain medication, the ALJ's characterization of the objective evidence is supported by substantial evidence in the record.

Finally, the ALJ rejected Dr. Lees' opinion because his treatment notes are devoid of examinations. Tr. 973. This is not supported by the record, as Dr. Lees's detailed treatment notes from visits in February, March, and April, 2004, reveal that he conducted physical examinations of plaintiff. Tr. 618-20. Much of but not all of the findings were reiterations plaintiff's subjective reports. However, given that substantial evidence supports the other reasons given for rejecting Dr. Lees' opinion, this error is harmless.

Accordingly, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record to not fully accept Dr. Lees' contradicted opinion regarding plaintiff's disability.

B. Dr. Jones

The ALJ rejected Dr. Jones' August 2005 opinion that plaintiff is disabled from all work because of his chronic neck, back, and shoulder pain. Tr. 972. The ALJ gave several reasons for rejecting Dr. Jones' opinion.

First, the ALJ rejected Dr. Jones' opinion because the

34 - FINDINGS & RECOMMENDATION

1  regulations are clear that the ultimate opinion on disability is an
2  issue reserved to the Commissioner.  Tr. 972.  Dr. Jones' opinion
3  that plaintiff is "incapacitated" by his degenerative disc disease
4  of the cervical spine and that "disability status would be
5  warranted" is precisely the type of opinion reserved to the
6  Commissioner. Tr. 688, 766. Moreover, Dr. Jones' opinion does not
7  include an assessment of plaintiff's specific functional
8  limitations, and is not accompanied by corroborating clinical and
9  laboratory diagnostic techniques.  See 20 C.F.R. § 404.1527(d)(2).

10      Second, the ALJ found that Dr. Jones made overstatements
11  about the severity of plaintiffs' radiographic studies that were
12  not supported by the record.  Tr. 973.  In support, the ALJ cited
13  the May 2005 MRI scan which reflected "moderate" degenerative
14  changes, which Dr. Jones stated were "severe."  Id.  The record
15  partially supports this characterization of the May 2005 diagnostic
16  testing, as the thoracic spine MRI revealed "mild degenerative disc
17  changes," and the cervical spine MRI revealed "moderate to
18  extensive degenerative disc changes," but no evidence of nerve root
19  impingement.  Tr. 70-71, 774-75.  As discussed above, the
20  diagnostic evidence does not consistently characterize the degree
21  of plaintiff's degenerative disc disease.  The ALJ also took issue
22  with Dr. Jones' mischaracterization of the severity of plaintiff's
23  shoulder arthritis as "severe" when diagnostic imaging in February
24  2004, May 2005, and August 2006, revealed, at most, mild changes.
25  Tr. 973.  The diagnostic imaging  relied upon by the ALJ clearly
26  shows a tear of a supraspinatus tendon, for which an orthopedist
27  ultimately recommended cortisone injections in late 2006.  Tr. 41,
28  71, 775, 869-70, 872-73.  However, with the exception of the August

35 - FINDINGS & RECOMMENDATION

2006 MRI, which showed "mild" degenerative changes in the right acromioclavicular joint, none of the imaging scans revealed any evidence of degenerative arthritis in the shoulder. Id. Thus, the ALJ's rejection of Dr. Jones' characterization of plaintiff's shoulder arthritis as "severe" is a rational interpretation of the evidence.

Finally, the ALJ rejected Dr. Jones' opinion because his treatment notes are devoid of examinations. Tr. 973. While there are several treatment notes where it appears as though Dr. Jones completed a physical examination of plaintiff, there are many more where Dr. Jones deferred the physical examination or the physical examination section was left blank. See Tr. 802, 810, 811, 813. While "devoid" may be an overstatement, this reason is supported by substantial evidence. Accordingly, the ALJ provided specific and legitimate reasons supported by substantial evidence in the record to not fully accept Dr. Jones' contradicted opinion regarding plaintiff's disability.

IV. Evaluation of RFC

Plaintiff contends that the ALJ erred in formulating his RFC because the ALJ failed to consider plaintiff's depression and medication side effects, resulting in an incomplete hypothetical to the VE. The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p. The ALJ must reach the RFC assessment based on all the relevant evidence in the case record, including medical reports and the effects of symptoms, including pain, that are reasonably

36 - FINDINGS & RECOMMENDATION

attributable to medically determinable impairments.    Robbins v.
Social Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

As discussed above, the ALJ did not err in failing to consider
whether plaintiff's depression is a severe impairment.  With regard
to medication side effects, plaintiff cites to SSR 96-1p, which
requires that in assessing a plaintiff's subjective statements
about symptoms and their limiting effects, the ALJ should consider
the type, dosage, effectiveness, and side effects of any medication
the claimant takes.    1996 WL 374186, at *3.    The ALJ found
plaintiff's testimony regarding the severity and limiting effects
of his impairments not credible and plaintiff does not challenge
that finding on appeal.    Because an ALJ need not incorporate
limitations identified through claimant testimony or medical
opinions that the ALJ permissibly discounted, the ALJ was not
required to incorporate these limitations into his RFC assessment.
Batson, 359 F.3d at 1197.

Regardless, the ALJ's RFC assessment reflects a detailed
analysis of the evidence as a whole.  The ALJ made his RFC finding
after reviewing all the evidence in the record, specifically
addressing the opinions of Drs. Lees and Jones as discussed
previously, the general medical record, the objective evidence, as
well as plaintiff's testimony and the testimony of two lay
witnesses regarding the severity of plaintiff's limitations.  Tr.
972-75.  The ALJ assessed greater limitations than the state agency
physicians, and fewer limitations than Dr. Lees.  Moreover, the
record demonstrates no work-related limitations stemming from
either his alleged depression or medication side effects.

The ALJ's finding that plaintiff's RFC included the ability to

37 - FINDINGS & RECOMMENDATION

perform a modified range of unskilled light work was supported by substantial evidence, as the ALJ properly took into account those limitations which were supported in the record and which did not interfere with his ability to work.   The ALJ's RFC finding should therefore be affirmed.

CONCLUSION

The Commissioner's decision should be affirmed.

SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.   Objections, if any, are due March 21, 2011.   If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due April 7, 2011. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 1st day of March, 2011.

/s/ Dennis J. Hubel

_____

Dennis James Hubel
United States Magistrate Judge